FILED

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

2008 JUN 11 A 9: 38

U.S. DISTRICT COURT
RICHMOND, VIRGINIA

BETTY J. OSTERGREN, )
)
Plaintiff, )
)
v. ) Civil No. 3:08CV362
)
ROBERT F. McDONNELL, in his official )
capacity as Attorney General of Virginia, )
)
Defendants. )
)

## MEMORANDUM IN SUPPORT OF MOTION FOR
## TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

By July 1, 2008, all circuit court clerks in Virginia will be required to make land records, many of which contain personal information such as Social Security Numbers, available online. On the same date, it will become unlawful for the plaintiff, Betty J. Ostergren, to post those *same documents* on her website. Ms. Ostergren asks the Court to issue a temporary restraining order (TRO) or preliminary injunction to prevent this infringement on Ms. Ostergren's right to publish truthful, public information obtained from the government.

### FACTS

Ms. Ostergren is a passionate advocate for individual privacy rights. Of particular concern for her is the ever-increasing availability of public records containing Social Security Numbers (SSNs) and other personal information on the Internet. (Compl. ¶ 5.)[1]

---

[1] References to "Compl." indicate the Verified Complaint filed herewith, and incorporated by reference herein.

In Virginia, circuit court clerks provide online access to land records[2] through a "secure remote access" system. Va. Code Ann. §§ 17.1-279; 17.1-292, *et seq*. Despite its reassuring name, any person may obtain documents through "secure remote access" by paying a small subscription fee to the circuit court clerk. *Id.* Any subscriber may obtain millions of documents containing names, addresses, birthdates, and SSNs. (*Id.* and Compl. ¶ 10.) As of July 1, 2008, all circuit court clerks will be required to provide secure remote access to land records. Va. Code Ann. §§ 17.1-279 (D), 17.1-294. The clerks are not required to redact SSNs from those documents. (Although the legislature passed such a requirement in 2007, it failed to appropriate funding, and therefore the provision did not go into effect. *See* Va. Code. Ann. 17.1-294, Historical and Statutory Notes; Acts 2007, ch. 548.)

Ms. Ostergren has found a particularly effective way to demonstrate the dangers of making such sensitive information widely available on the Internet. Through secure remote access, she has obtained land records containing the SSNs of various legislators, circuit court clerks, and other government officials – the very people who, in her view, should be working to stop the dissemination of private information on the Internet. She posts these documents on her website, TheVirginiaWatchdog.com. (Compl. ¶¶, 7,12.)

This year, the General Assembly took action to prevent Ms. Ostergren from posting these publicly available documents on her advocacy website. The Personal Information Privacy Act (PIPA), prohibits the dissemination of SSNs. Va. Code. Ann. § 59.1-443.2 (A) (1). Until this year the statute contained an exception for "records required by law to be open to the public." § 59.1-443.2 (D). In its 2008 session, the

---

[2] "Land records" are any documents that affect title to real estate recorded with the circuit court. Thus, they include not only deeds and mortgages, but divorce decrees, judgments, and liens. Va. Code Ann. § 17.1-292.

2

General Assembly eliminated this exception, making it unlawful to publish records containing SSNs. Acts 2008, ch. 562.

A violation of § of 59.1-443.2 is a "prohibited practice" under the Virginia Consumer Protection Act (VCPA), Va. Code Ann. § 59.1-196 *et seq*. The defendant, the Attorney General of Virginia, has extensive power to enforce the VCPA. Specifically:

- He may obtain a civil investigative order, requiring a person who is the subject of an investigation for a VCPA investigation to turn over information relevant to the investigation, Va. Code Ann. § 59.1-201;

- He may issue a civil investigative demand to witnesses "by which he may (i) compel the attendance of such witnesses; (ii) examine such witnesses under oath before himself or a court of record; (iii) . . . require the production of any books or papers that he deems relevant or material to the inquiry; and (iv) issue written interrogatories to be answered by the witness served . . . ." Va. Code Ann. §§ 59.1-201.1; 59.1-9.10.

- He may initiate an action in circuit court to enjoin violations of the VCPA, Va. Code Ann. § 59.1-203;

- He may recover from the violator $2,500 per violation, plus costs of up to $1,000 per violation, and attorney's fees. Va. Code. Ann. § 59.1-206.

Thus, the amendment to § of 59.1-443.2 puts Ms. Ostergren in substantial danger of intrusive investigations and monetary loss if she continues to post public records on her website after July 1, 2008.

## ARGUMENT

"In deciding whether to issue a preliminary injunction, a court must consider (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest." *Newsome v. Albemarle County Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) (internal quotation marks and citation omitted).

"The balance-of-hardship test correctly emphasizes that, where serious issues are before the court, it is a sound idea to maintain the status quo ante litem, provided that it can be done without imposing too excessive an interim burden upon the defendant, . . .for otherwise effective relief may become impossible." *Blackwelder v. Seilig Mfg. Co.*, 550 F.2d 189, 194-95 (4th Cir. 1977). In applying this balancing test, primary importance must be attached to the vindication of the plaintiff's right and the potential injury to it if the preliminary injunction is not granted: "'It is sufficient (to grant the motion) if the court is satisfied that there is a probable right and a probable danger, and that the right may be defeated, unless the injunction is issued, and considerable weight is given to the need of protection to the plaintiff as contrasted with the probable injury to the defendant.'" *Id.* at 193 (*quoting Sinclair Refining Co. v. Midland Oil Co.*, 55 F.2d 42, 45 (4th Cir. 1932)).

## I. THE BALANCE OF HARDSHIPS FAVORS PRELIMINARY RELIEF.

If a preliminary injunction or TRO is not granted, Ms. Ostergren will be forced to remove the public records from her website by July 1, 2008, or risk the sanctions described above. "The loss of First Amendment freedoms, for even minimal periods of

time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347 (1976). Ms. Ostergren's website constitutes pure political speech of the sort "at the core of the First Amendment." *Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466 (1988). She is advocating on a manner of vital public concern: the availability of sensitive personal information through public documents available on the Internet. The public records posted to her site are essential to her message, in that they graphically illustrate the type of information the government makes accessible to the public.

By contrast, the defendant will suffer no great harm should an injunction be granted. The Government will no doubt argue that allowing Ms. Ostergren to continue posting public documents containing SSNs places individuals at risk for identity theft. But those same documents are and will continue to be available on online *regardless* of Ms. Ostergren's website – placed there by the Government itself. Indeed, while Ms. Ostergren's website has several dozen illustrative examples of public records with SSNs, the Government is responsible for putting millions, of such records in the public domain and accessible through the Internet.[3]

The balance of hardships decisively favors a preliminary injunction.

II.    THE PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS.

    A.    Any Restriction on the Publication of Truthful Information Must be Narrowly Tailored to a State Interest of the Highest Order.

The defendant must pass a very high hurdle to defend this statute. "[S]tate action to punish the publication of truthful information seldom can satisfy constitutional standards." *Smith v. Daily Mail*, 443 U.S. 97, 102 (1979). Indeed, in every case to

---

[3] Notably, Ms. Ostergren only posts public records containing personal information about public officials, who have the power to take legislative or administrative action toward redacting SSNs from public records placed on line. The Government makes available the SSNs of ordinary citizens who are unable to do anything about it.

address the issue, the Supreme Court has refused to allow government to sanction the publication of truthful information lawfully obtained, on matters of public concern. *See, e.g., Bartnicki v. Vopper*, 532 U.S. 514 (2001) (overruling damage award against radio commentator who broadcast contents of a private telephone call on a matter of public concern that had been unlawfully intercepted, where the tape was lawfully obtained by commentator); *The Florida Star v. B.J.F.*, 491 U.S. 524 (1989) (striking down damage award against newspaper that published the name of a rape victim obtained from police record); *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97 (1979) (overturning newspaper's indictment for publishing the name of a juvenile offender); *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829 (1978) (overturning newspaper's conviction for publishing information about judicial disciplinary inquiry); *Oklahoma Publ'g Co. v. District Court In and For Oklahoma County*, 430 U.S. 308 (1977) (overturning injunction against publication of juvenile delinquency proceedings, when the press had been allowed to be present); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) (overturning injunction against publication of information prejudicial to criminal defendant); *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975) (striking down damages award against reporter who broadcast the name of a rape victim); *New York Times Co. v. U.S.*, 403 U.S. 713 (1971) (reversing injunction against publication of a classified study of the Vietnam War).

*The Florida Star v. B.J.F.*, 491 U.S. 524, 541 (1989), set forth the standard by which to evaluate such cases: "Where a newspaper[4] publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, only when

---

[4] Although most of the Supreme Court cases in this area deal with newspapers, there is no reason to treat a website differently for First Amendment purposes. *See Sheehan v. Gregoire*, 272 F.Supp.2d 1135, 1145 (W.D. Wash. 2003) ("Plaintiff's website, a vehicle of mass communication, is analytically indistinguishable from a newspaper. It communicates truthful lawfully-obtained, publicly-available personal identifying information with respect to a matter of public significance . . .")

6

narrowly tailored to a state interest of the highest order." The Court explained that such a stringent standard was necessary to strike the appropriate balance between individual privacy rights and free speech.

First, the Court noted that because only "lawfully obtained" information is protected, "the government retains ample means of safeguarding significant interests upon which publication may impinge," especially when the information is in the government's own custody:

> The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government or its officials where the government's mishandling of sensitive information leads to its dissemination. Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts.

491 U.S. at 534. *See also Landmark Communications, supra,* 435 U.S. at 845 ("[M]uch of the risk can be eliminated through careful internal procedures to protect the confidentiality of Commission proceedings"); *Oklahoma Publ'g,* 430 U.S. at 311 (noting trial judge's failure to close juvenile hearing to the public, including members of the press, who later broadcast juvenile defendant's name); *Cox Broadcasting, supra,* 420 U.S. at 496 ("If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information").

Second, "punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." *The Florida Star,* 491 U.S. at 535. That is, whatever harm is feared from making the information public already occurred when the *state* makes the information public. The Court observed that "where the government has made certain

7

information publicly available, it is highly anomalous to sanction persons other than the source of its release." *Id.* Thus, "once the truthful information was 'publicly revealed' or 'in the public domain' the [government may] not constitutionally restrain its dissemination." *Id.* (quoting *Daily Mail*, 443 U.S. at 103) (alteration added).

Third, a prohibition on publishing truthful information provided by the government itself could lead to "timidity and self-censorship" on the part of speakers:

> A contrary rule, depriving protection to those who rely on the government's implied representations of the lawfulness of dissemination, would force upon the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication. This situation could inhere even where the newspaper's sole object was to reproduce, with no substantial change, the government's rendition of the event in question.

*Id.* at 536.

### B. The Prohibition on Disseminating Public Records Containing SSNs is Not Narrowly Tailored to a State Interest of the Highest Order.

The prohibition against publishing public records that contain SSNs is not "narrowly tailored to a state interest of the highest order." The plaintiff will not dispute that maintaining the privacy of SSNs is important; the whole point of her website is to persuade the government to redact SSNs from documents that are made available on line. But this statute is not narrowly tailored – or even reasonably calculated – to achieve this interest.

First, the statute will not take even a single SSN out of the public domain. As explained earlier, all of the documents posted on Ms. Ostergren's website are available via the Internet from government websites. Second, the Government has far more effective means to protect individual privacy: It can redact SSNs from public records *before* they are made available on line. Lacking the energy or political will to take this

8

obvious step, it instead seeks to prevent Ms. Ostergren from posting the documents to which the Government itself has provided easy access.

In this respect, the prohibition on disseminating public records is even more poorly tailored that the restrictions considered by the Supreme Court in most the cases cited earlier. In nearly all of those cases, the government had made some effort to keep the information at issue confidential, but was thwarted by the mistake or misconduct of a government official, or the acts of third parties. In *The Florida Star*, the public police report inadvertently contained the rape victim's name, which was supposed to have been kept confidential. 491 U.S. at 546 (White, J., dissenting). In *Daily Mail*, the state kept secret the identity of the juvenile offender, but reporters learned his identity by interviewing eyewitnesses. 443 U.S. at 99. In *Oklahoma Publ'g*, the judge failed to follow the state law keeping juvenile proceedings closed. 430 U.S. at 311. In *New York Times*, the Pentagon Papers were classified, but were leaked by one of their authors.

Here, the state has made no effort to keep the SSNs on these land records confidential. Instead, it has affirmatively required circuit court clerks to make the records available on line by July 1, 2008, without requiring redaction of SSNs. In *Cox Broadcasting*, the Court made clear that there can be no liability for republishing what the government has deliberately made public. "At the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records." 420 U.S. at 496.

> By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our

type of government in which the citizenry is the final judge of the proper conduct of public business. In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.

*Id.* at 495. "*Cox Broadcasting* stands for the proposition that the State cannot make the press its first line of defense in withholding private information from the public-it cannot ask the press to secrete private facts that the State makes no effort to safeguard in the first place." *The Florida Star*, 491 U.S. at 544, White, J., dissenting.

For these reasons, in a case nearly identical to this one, a district court judge found that the state could not prohibit an individual from posting personal information obtained from public records on his own website. *Sheehan v. Gregoire*, 272 F.Supp.2d 1135 (W.D. Wash. 2003). The statute in that case prohibited the distribution of the residential address, residential telephone number, birth date, or social security number of any law enforcement officer, corrections officer, or court employee. The plaintiff's website, which dealt with police accountability, contained such personal information, which he had obtained from public records. Relying on *The Florida Star*, the court held that the statute did not serve a "state interest of the highest interest," since the state itself had made the information public. 272 F.Supp.2d at 1144-45.

III. A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.

The public interest is not served by the enforcement of an unconstitutional statute. *Newsom*, 354 F.3d at 261 ("Surely, upholding constitutional rights serves the public interest.") Although the public has an interest in protecting the privacy of social security numbers, a preliminary injunction will not frustrate this interest. As explained at length

10

above, all of the documents on Ms. Ostergren's website are readily available through the Internet from the government itself.

## CONCLUSION

For the foregoing reasons, the plaintiff respectfully requests the Court to enter a preliminary injunction prohibiting the defendant from enforcing Va. Code. Ann. § 59.1-443.2 against the plaintiff.

Dated: June 11, 2008

Respectfully submitted,

BETTY J. OSTERGREN

By counsel:

*[signature: Rebecca K. Glenberg]*

Rebecca K. Glenberg (VSB No. 44099)
American Civil Liberties Union of Virginia
　　Foundation, Inc.
530 E. Main Street, Suite 310
Richmond, Virginia 23219
(804) 644-8080
(804) 649-2733 (FAX)
rglenberg@acluva.org