IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| BETTY J. OSTERGREN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 3:08cv362 |
| ) | |
| ROBERT F. McDONNELL, in his official ) | |
| capacity as Attorney General of Virginia, ) | |
| ) | |
| Defendant. ) | |
| ) | |

### **PLAINTIFF'S PRETRIAL BRIEF**

Plaintiff Betty J. Ostergren, by counsel, submits the following Pretrial Brief[1]:

### **Findings of Fact[2]**

1.　　Plaintiff Betty J. Ostergren ("Ms. Ostergren") is a resident of Hanover County, Virginia. (Stipulation ¶ 1.)

2.　　Defendant Robert F. McDonnell is the Attorney General of Virginia. A such, he is charged with the enforcement the state laws of Virginia, and, specifically, with enforcement of the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196, *et seq*. At all times relevant, the defendant has acted and continues to act under color of state law. (Stipulation ¶ 2.)

3.　　Ms. Ostergren advocates for privacy rights in Virginia and nationwide. In particular, she has opposed the online availability through government websites of public

---

[1]　Per the Court's instruction at the June 30, 2008 hearing (Tr. at 70, 73), this Brief is structured as Proposed Findings of Fact and Conclusions of Law.

[2]　The basic facts of the case are set forth in the Stipulation filed herewith. Plaintiff's Declaration is attached hereto only to address two specific factual issues: The reasons why plaintiff feels it necessary to include SSNs in her online postings, and the ease with which SSNs can be discovered through the "secure remote access" system.

records containing sensitive personal information such as Social Security Numbers (SSNs), birth dates, mother's maiden names, financial account numbers and signatures. (Stipulation ¶ 3.)

4. In furtherance of her advocacy work, Ms. Ostergren lobbies legislators, writes letters and makes telephone calls to public officials, and has made numerous media appearances. She has also contacted thousands of individuals across the country whose personal identifying information is available online through government websites. (Stipulation ¶ 4.)

5. Ms. Ostergren established the website www.TheVirginiaWatchdog.com in 2003. On this website, she has posted examples of online public records containing SSNs to alert members of the public that their own personal information may be online somewhere. Ms. Ostergren does not sell any products or advertisements or otherwise generate any revenue from or for the website. (Stipulation ¶ 5.)

6. Ms. Ostergren has obtained the land records of various public officials through Virginia's secure remote access systems and posted them on her website. Her website also includes public records obtained from government websites in other states. (Stipulation ¶ 7.)

7. Before she began posting public records to her website, Ms. Ostergren found it very difficult to attract the attention of the public and government officials to her cause. Few people seemed to understand or care that the government was endangering the public welfare by making the personal information of millions of Americans easily accessible on line. (Ostergren Decl. ¶ 4.)

8. Posting the records online proved to be very effective way of calling attention to this danger. The media began to pay attention to the problem, giving Ms. Ostergren the opportunity to explain her position in countless newspaper articles and television and radio interviews nationwide.

9. Government officials also began to take note. Many state and local government websites outside of Virginia began to redact SSNs from public records available on line, or remove such records from the websites altogether, after Ms. Ostergren posted records from those websites on TheVirginiaWatchdog.com. She has achieved this type of result in Arkansas, Florida, Washington, Missouri, Arizona, Texas, North Carolina, Massachusetts, Mississippi, and Ohio. (Ostergren Decl. ¶ 6.)

10. Posting public records on her website – with SSNs intact – has been an effective advocacy tool for Ms. Ostergren, for several reasons. First, seeing a document with an SSN posted on the website makes a viewer understand instantly, at a gut level, why it is so important to prevent the government from making this information available on line. Merely describing the kind of information available on line and why it is so dangerous does not have nearly the emotional impact that is conveyed by the document itself, posted on the website. (Ostergren Decl. ¶ 8.)

11. Second, by posting the records of public officials like court clerks, legislators, and others, Ms. Ostergren is able to catch the attention of those whom she is most anxious to reach with her message – those who have the influence to address the problem. Using those particular public documents helps immeasurably to direct her message to the intended audience. (Ostergren Decl. ¶ 9.)

12. Under Virginia's "secure remote access" system, any person may, for a nominal fee, obtain online access to all of the land records for a given locality. (Stipulation ¶ 6.)

13. Ms. Ostergren has been accessing the land records websites of various Virginia circuit court clerks since 2002, and has become intimately familiar with those sites. She has downloaded or printed thousands of documents containing of SSNs and other personal information of Virginia residents (only a couple of dozen of which are posted on her website). (Ostergren Decl. ¶ 11.)

14. The "land records" available through "secure remote access" include not only those records most obviously related to real estate, such as deeds and mortgages, but also many other kinds of records such as judgments, state and federal tax liens, divorce decrees, guardianship papers, financing statements, powers of attorney, name change documents, and wills, all of which frequently contain SSNs and other personal information. (Ostergren Decl. ¶ 13; *see also* Va. Code §§ 17.1-227 (recordation of deeds and mortgages); § 8.01-446 (judgments); § 8.9A-501 *et seq.* (financing statements); § 20-107.3 (divorce decrees); § 58.1-314 (tax liens).)

15. Ms. Ostergren learned from experience that a subscriber to one of Virginia's "secure remote access" websites can discover thousands of SSNs within minutes, simply by using specific search terms that lead to large numbers of documents that frequently contain SSNs. (Ostergren Decl. ¶14.)

## Conclusions of Law

**The Relevant Virginia Statutes**

1.  Virginia law requires that circuit court clerks make all land records available on the Internet by "secure remote access," by July 1, 2008. Va. Code Ann. §§ 17.1-279 (D), 17.1-294. Such land records, which include deeds, mortgages, divorce decrees, and tax liens, often include SSNs.

2.  Virginia law does not require clerks to redact SSNs or other personal information from land records prior to making them available by secure remote access. In 2007, the General Assembly passed a provision that would have required such redaction. However, the same bill also stated that the redaction provision would not go into effect unless the legislature appropriated funding for it. Since funding was not appropriated, the provision did not go into effect. *See* Va. Code. Ann. 17.1-294, Historical and Statutory Notes; Virginia Acts 2007, ch. 548. Another statute prohibits clerks from posting documents containing SSNs on the Internet, but that statute contains an exception for land records mad available through secure remote access. Va. Code Ann. § 17.1-293 (B), (E).

3.  Virginia's Personal Information Privacy Act (PIPA) provides, *inter alia*, that no person shall "[i]ntentionally communicate an individual's social security number to the general public." Va. Code. Ann. § 59.1-443.2 (A) (1). Until this year, the statute contained an exception for "records required by law to be open to the public." § 59.1-443.2 (D). Under this exception, Ms. Ostergren's posting of public land records with SSNs on her website for advocacy purposes was lawful.

4. In its 2008 session, the General Assembly eliminated the public records exception from § 59.1-443.2, making it unlawful for individuals to disseminate public records containing SSNs. Acts 2008, ch. 562. The change went into effect on July 1, 2008.

5. By its terms, a violation of § 59.1-443.2 constitutes a prohibited practice under the Virginia Consumer Protection Act (VCPA) § 59.1-196 *et seq*.

6. The defendant Attorney General has substantial authority to enforce the VCPA. Specifically:

- He may obtain a civil investigative order, requiring a person who is the subject of an investigation for a VCPA violation to turn over information relevant to the investigation, Va. Code Ann. § 59.1-201;

- He may issue a civil investigative demand to witnesses "by which he may (i) compel the attendance of such witnesses; (ii) examine such witnesses under oath before himself or a court of record; (iii) . . . require the production of any books or papers that he deems relevant or material to the inquiry; and (iv) issue written interrogatories to be answered by the witness served . . . ." Va. Code Ann. §§ 59.1-201.1; 59.1-9.10.

- He may initiate an action in circuit court to enjoin violations of the VCPA, Va. Code Ann. § 59.1-203;

- He may recover from the violator $2,500 per violation, plus costs of up to $1,000 per violation, and attorney's fees. Va. Code. Ann. § 59.1-206.

**Section 59.1-443.2 is Unconstitutional under *Cox Broadcasting* and its Progeny.**

7. The Supreme Court has made clear that "the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 496 (1975).

8. In *Cox Broadcasting* and subsequent cases, the Court articulated a number of rationales for this principle. First, "the interests in privacy fade when the information involved already appears on the public record." *Cox Broadcasting*, 420 U.S. at 494-95. Second, "[b]y placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served." *Id.* at 495. Third, a prohibition on publication of information gleaned from public records "would invite timidity and self-censorship." *Id.* at 496. *See also The Florida Star v. B.J.F.*, 491 U.S. 524, 526 (1989) ("A contrary rule, depriving protection to those who rely on the government's implied representations of the lawfulness of dissemination, would force upon the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication. . . even where the newspaper's sole object was to reproduce, with no substantial change, the government's rendition of the event in question").

9. Finally, because the information is in the government's control, the government has plenty of means at its disposal to protect privacy without engaging in censorship. "If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of

private information. Their political institutions must weigh the interests in privacy with the interests of the public to know and of the press to publish." *Cox Broadcasting* at 496. As the Court elaborated in *The Florida Star*:

> To the extent sensitive information is in the government's custody, it has even greater power to forestall or mitigate the injury caused by its release. The government may classify certain information, establish and enforce procedures ensuring its redacted release, and extend a damages remedy against the government or its officials where the government's mishandling of sensitive information leads to its dissemination. Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts.

491 U.S. at 534. *See also Oklahoma Pub. Co. v. District Court*, 430 U.S. 308 (1977) (prohibiting sanction against newspaper for publishing name of juvenile offender, where "members of the press were in fact present at the hearing with the full knowledge of the presiding judge," who failed to exercise his statutory authority to close the hearing).

   10. *Cox Broadcasting* – like the present case – involved court records that the government deliberately made public. In subsequent cases, such as *The Florida Star* and *Oklahoma Pub. Co.*, the Court extended the *Cox Broadcasting* principle, holding that even when the government *inadvertently* discloses information, it cannot then punish private entities who republish the same information. Justice White, dissenting in *The Florida Star*, would not have gone so far. But he nonetheless reaffirmed the central holding of *Cox Broadcasting*, "that the State cannot make the press its first line of defense in withholding private information from the public-it cannot ask the press to secrete private facts that the State makes no effort to safeguard in the first place." *The Florida Star*, 491 U.S. at 544 (White, J., dissenting).

11. Virginia Code § 59.1-443.2 does precisely what *Cox Broadcasting* prohibits: it "ask[s] the press to secrete private facts that the State makes no effort to safeguard in the first place."

12. Indeed, in the present case, the Commonwealth not simply failed to safeguard land records containing SSNs, it has affirmatively made those documents available for anyone to see with very little effort on the Internet. Under these circumstances, the rationales supporting *Cox Broadcasting* have even greater force. If "the interests in privacy fade when the information involved already appears on the public record," *Cox Broadcasting,* 420 U.S. at 494-95, then those interests are even more greatly diminished when the government makes that information available on line. Moreover, the government has even greater means than it did in *Cox Broadcasting* to protect citizens' privacy without infringing on free speech rights. Most obviously, it could either refrain from making documents containing SSNs available on the Internet, or it could redact SSNs from online documents.

**There is no Reason to Deviate from *Cox Broadcasting* in the Present Case.**

13. The defendant has suggested that *Cox Broadcasting* and its progeny do not govern the case, either because the case involves Internet communication or social security numbers or both. But these circumstances provide no basis for deviating from *Cox Broadcasting*'s clear instruction that the government may not prohibit the publication of information that the government itself has made public.

14. First, the Supreme Court has rejected the contention that the special nature of the Internet requires special First Amendment standards. In *Reno v. ACLU*, 521 U.S. 844 (1997), which struck down a statute meant to protect minors from "indecent"

materials on the Internet, the government argued that the Internet should be subjected to less stringent First Amendment standards. The Court disagreed, stating that "our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." 521 U.S. at 870. If anything, the open, democratic nature of the Internet, in which "any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox," *Id.*, entitles it to greater, not lesser, First Amendment protection.

15. The reasoning of such cases as *Cox Broadcasting* and *The Florida Star* apply just as persuasively regardless of the medium of communication. That is because those cases hinge not on the private entity's means of communication, but on the government's act of making the information public in the first place. It is because the government published this information that Ms. Ostergren's right to republish it must be protected.

16. It is true that by using the Internet, the plaintiff is reaching a much wider audience than she would using more traditional means. But, by the same token, the government has also used the Internet to make documents containing SSNs available worldwide, on a vastly greater scale than has Ms. Ostergren. The government cannot argue that Ms. Ostergren's use of the Internet is drastically more harmful than the use of other forums, while the government rushes to use the same medium to make *all* land records available.

17. Nor does the fact that SSNs are at issue call for a different legal standard from that employed in *Cox Broadcasting* and *The Florida Star*. First, the rationale of those cases remains the same regardless of the type of information communicated. That

is, because the government has made the information available, the privacy interest in it is diminished, and, because the information is in the government's control, it has more effective means at its disposal to keep it private than by censoring private individuals.

18. Any claim by the Commonwealth that the disclosure of SSNs is uniquely harmful must be viewed skeptically, in view of the government's own actions in ensuring that millions of documents containing SSNs are available through government websites with a few clicks of the mouse.

19. Moreover, although the disclosure of an SSN can lead to dire consequences, it is not at all clear that those consequences are more dire than, say, the exposure of the rape victim's name in *The Florida Star*:

> For B.J.F. . . . the violation she suffered at a rapist's knifepoint marked only the beginning of her ordeal. A week later, while her assailant was still at large, an account of this assault-identifying by name B.J.F. as the victim-was published by The Florida Star. As a result, B.J.F. received harassing phone calls, required mental health counseling, was forced to move from her home, and was even threatened with being raped again.

491 U.S. at 543-43 (White, J., dissenting).

20. The claim that Ms. Ostergren's message could be communicated just as well without posting documents containing SSNs also does not justify an abandonment of the *Cox Broadcasting* principle. Just as it is not the government's business to tell an individual *what* to say, it is not the government's business to tell her *how* to say it. *See*, *e.g.*, *Texas v. Johnson*, 491 U.S. 397, 416 n. 11 (1989) (rejecting dissent's argument that a protester's act of flag-burning could be prohibited because it "conveyed nothing that could not have been conveyed and was not conveyed just as forcefully in a dozen different ways").

21. The posting of public records – with SSNs intact – on Ms. Ostergren's website is an essential part of how she communicates her message. First, keeping the SSN itself on the document delivers the message at a "gut level"; its impact is far greater and more immediate than a simple description the type of information that is available on line. *See Boos v. Barry*, 485 U.S. 312, 321 (1988) ("The emotive impact of speech on its audience is not a 'secondary effect'"). Second, by posting the documents of specific government officials, Ms. Ostergren is able to catch the attention of precisely those persons to whom she wishes to direct her message, those who are able to influence public policy with respect to the online availability of public records. The Supreme Court has recognized that the ability to direct a message at a particular audience is a constitutionally protected aspect of speech. "The First Amendment protects the right of every citizen to reach the minds of willing listeners and to do so there must be opportunity to win their attention." *Heffron v. International Soc. for Krishna Consciousness, Inc*., 452 U.S. 640, 655 (1981) (internal quotation marks and citations omitted). *See also City of Ladue v. Gilleo*, 512 U.S. 43, 57 (1994) (noting that "a person who puts up a sign at her residence often intends to reach *neighbors,* an audience that could not be reached nearly as well by other means.")

22. The effectiveness of Ms. Ostergren's means of communicating her message is evidenced by the fact that, since she began posting public records on her websites, she has been frequently interviewed by news media across the nation. Moreover, her approach caused a number of state and local government websites to redact SSNs from online documents, or remove such documents from their sites altogether.

## CONCLUSION

For the foregoing reasons, the plaintiff respectfully requests that the Court declare Va. Code Ann. § 59.1-443.2 unconstitutional as applied to the dissemination of public records, and to issue a permanent injunction against its enforcement against the plaintiff or any others similarly situated.

Respectfully submitted,

BETTY J. OSTERGREN

By:

_____/s/_____
Rebecca K. Glenberg (VSB No. 44099)
American Civil Liberties Union of Virginia
 Foundation, Inc.
530 E. Main Street, Suite 310
Richmond, Virginia 23219
(804) 644-8080
(804) 649-2733 (FAX)
rglenberg@acluva.org

Frank M. Feibelman VSB #13877
Cooperating Attorney for the ACLU of Virginia
5206 Markel Rd., Suite 102
Richmond, Virginia 23230
(804) 355-1300
FAX: (804) 355-4684

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of July, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to the following:

> James V. Ingold
> Office of the Attorney General
> 900 E. Main Street
> Richmond, Virginia 23219
> JIngold@oag.state.va.us

/s/<br>Rebecca K. Glenberg