IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**BETTY J. OSTERGREN,**

      **Plaintiff,**

      v.                    Civil Action No. 3:08cv362

**ROBERT F. MCDONNELL,**

      **Defendant.**

## DEFENDANT'S PRETRIAL BRIEF

COMES NOW the Defendant, Robert F. McDonnell ("Defendant"), by counsel, in response to the Order of this Court on June 30, 2008, and in response to Plaintiff's pretrial brief, stating as follows:

**I.**                          **Introduction.**

Defendant relies on facts in the Stipulation filed on July 7, 2008, and the Affidavit by John G. Dicks of July 14, 2008, and objects to the Declaration of Betty Ostergren filed July 7, 2008, to the degree that it attempts to do anything more than express her personal opinions about matters, many of which are not germane or even relevant to the discrete issue now before this Court. Defendant also objects to any request for relief that extends beyond

application of the amendment to Section 59.1-443.2, *Code of Virginia* (1950, as amended) to her website's use of social security numbers obtained from public land records as defined by Section 17.1-292, *Code of Virginia.*

The principal issue in this case is the privacy of the social security number, and the Commonwealth's simple attempt to prevent their dissemination by enacting a statutory amendment tailored precisely to achieve that end. Plaintiff, a self-described privacy advocate and nationwide lobbyist, asks this Court to declare unconstitutional the statutory amendment to Section 59.1-443.2. Certain social security numbers were placed in some public land records by citizens or their agents in an era when the information merely served as a convenient identifier and when internet-driven identity theft was unimaginable. Thus, for the purpose of finding the amended statute to be a narrowly tailored constitutional protection, it is irrelevant either that individual clerks of court voluntarily chose to put public land records online years ago or that the Commonwealth mandated on July 1, 2008, that all clerks of court put public land records online. On that date, the Commonwealth did not place anything new under the sun in the public domain. To the contrary, this information always has been accessible in person and has been online for some time through most local jurisdictions.

On her website, Plaintiff posts individuals' social security numbers and chronicles her many media appearances, which she makes supposedly with the principal aim of furthering her advocacy. While Plaintiff focuses on social

security numbers of legislators and clerks because she believes they are responsible for online availability of public land records through "secure remote access," her website includes social security numbers of individuals who are not public officials and who have no Virginia public land records. Plaintiff's concern only is that some of this information remains accessible online, not that it is available in public land records; indeed, she argues on her website that if people want to see these records, they should drive to the courthouse, and much of the data she obtained herself was in person and not online as a paid subscriber through the secure remote access system.

"Secure remote access" is limited to paid subscribers and government users. It is governed by statute and standards adopted by the Virginia Information Technologies Agency. As Plaintiff acknowledged in oral argument on her motion for preliminary injunction, roughly two-thirds of Virginia clerks of court already voluntarily chose to place public land records online before July 1, 2008. Only a few clerks have not redacted all social security numbers from backfiles. If there is unauthorized use of information, clerks have authority to terminate the subscriber agreement.

The federal government has taken measures to protect individual's social security numbers. Virginia attempts to complement the federal example. Section 59.1-443.2 prohibits intentional communication of another individual's social security number to the general public. Importantly, the Commonwealth did not place this information in the public domain. Custom

has resulted in the presence of social security numbers in some public land records. Until Plaintiff's "advocacy," access to this information was not known by the general public. Keeping social security numbers from public dissemination is a compelling government interest on behalf of citizens. Virginia has enacted a number of provisions to keep social security numbers out of the public domain as much as possible, within necessary budgetary constraints. The statute at issue herein merely is another legislative enactment seeking to safeguard individual privacy interests by limiting public dissemination specifically of social security numbers.

The statute ignores the identity and motive of the person disseminating social security numbers and focuses solely on the social security number itself in determining the very limited, and highly personal, information that is exempt from dissemination. The statute only addresses social security numbers, which are not merely different from other personal information but are unique personal identifiers. There are compelling public policy reasons for the statute's careful, narrowly tailored prohibition, and Plaintiff has not met her burden of demonstrating its unconstitutionality.

## II. The Amended Statute Is Constitutional as Applied to Plaintiff's Website.

The challenged amended statute is capable of constitutional application. The Court must determine the public interest. The crux of this case is that while most of Plaintiff's website is constitutionally protected

political speech, there is no public interest in dissemination of individuals' social security numbers online. It is hard to conceive of a deeper personal privacy invasion. Social security numbers not only are different from other personal identifying information such as names, addresses and phone numbers; they are unique in their sensitivity when it comes to privacy and enabling identity theft. Keeping social security numbers private is a compelling government interest on behalf of citizens.

The amended statute does not prohibit Plaintiff from using public documents effectively for public information and advocacy purposes. To the contrary, Plaintiff may use the documents to articulate her point as long as she does not violate privacy rights and enable identity theft by posting individuals' personal social security numbers. The amended statute, at most, would have an incidental effect on Plaintiff's ability to express her opinion. There may be a situation where publication of a specific social security number in and of itself could constitute political speech, but Plaintiff herein presents no such basis. While she certainly advocates a message on her website, her specific inclusion of actual social security numbers in no way communicates about, and is in conflict with, her professed, preferred public policy.

If this Court is looking for a test to apply given the need for new analysis on the frontier of internet law and the facts presented by this case, it should uphold the amended statute as acceptable within existing

constitutional limitations because there is no public interest or social value in disseminating social security numbers, which define an exact zone of privacy, and a prohibition on dissemination does not inhibit the free exchange of ideas or infringe protected speech in common use at this time by law-abiding citizens for lawful purposes. This test derives from the following discussion.

To understand how best to look at this case, two opinions this term by the United States Supreme Court - *District of Columbia v. Heller*, 554 U.S. ___ 07290 (2008), 2008 U.S. Lexis 5268 and *United States v. Williams*, 553 U.S. ___ (2008), 2008 U.S. Lexis 4314 - are instructive. *Heller* involved a Second Amendment challenge to a handgun ban and a requirement to keep lawfully owned firearms unloaded and disassembled or bound by a trigger lock or similar device. The Court found that the Second Amendment protects a right to a firearm *as long as it is the type of weapon in common use at the time for traditionally lawful purposes,* such as the handgun. The Court also found the requirement that any lawful firearm be disassembled or bound by a trigger lock or similar device makes it impossible for citizens to use arms for the core lawful purpose of self-defense and is hence unconstitutional.

The Court emphasized, "the Second Amendment conferred an individual right to keep and bear arms. Of course the right was not unlimited, just as the First Amendment's right of free speech was not, see, *e.g., United States v. Williams*, 553 U.S. ___ (2008). Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort*

6

of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose.*" 2008 U.S. Lexis at 41-42. The Court observed, "Like most rights, the Second Amendment right is not unlimited…to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 94.

The Court cited *United States v. Miller*, 307 U.S. 174 (1939), which upheld a conviction for transporting an unregistered short-barreled shotgun against a Second Amendment challenge. Noting that *Miller* explained that the basis for the Second Amendment not applying was that a short-barreled shotgun was not the *type of weapon* eligible for Second Amendment protection, the Court in *Heller* provided the following quote, "'we cannot say that the Second Amendment guarantees the right to keep and bear *such an instrument.*' 307 U.S at 178 (emphasis added)." *Id*. at 87. The Court in *Heller* then clarified that *Miller* stands "for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Id*. at 88.

What types of weapons? The Court described, "In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same," *Id*. at 91 (quoting *State v. Kessler*, 289 Ore. 359, 368, 614 P.2d 94,98 (1980) (citing G. Neumann, Swords and Blades of the American Revolution 6-15, 252-254 (1973)). For a more contemporary application, the Court again looked to

7

*Miller* to define constitutionally protected weapons as "the kind in common use at the time." *Id*. (quoting *Miller*, 307 U.S. at 179), which it noted as "another important limitation on the right to keep and bear arms." *Id*. at 95. Particularly, the Court declared *Miller* to say "that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id* at 92. The Court also cited machineguns, *Id*. at 91, and M-16 rifles, *Id*. at 96, as likely falling in the weapon category that is excluded from constitutional protection and listed an inexhaustive sample list of constitutional limits on Second Amendment application. *Id*. at 95.

The Court acknowledged, "the inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *Id*. at 97. "The American people have considered the handgun to be the quintessential self-defense weapon." *Id*. at 100. The Court also addressed the requirement that firearms in the home be rendered and kept inoperable at all times and found, "This makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." *Id*.

Thus, *Heller* found the D.C. statute unconstitutional because it was an un-narrowly tailored, total ban of use of a common weapon typically possessed by law-abiding citizens for lawful purpose*s*. Such cannot be said of

8

the amended statute before this Court, which is narrowly-tailored and enjoys widespread popular support, especially as applied to Plaintiff's website and her atypical misuse of social security numbers therein in an uncommon way that serves *only* to facilitate invasion of personal privacy and an unlawful purpose, identity theft. Plaintiff's dissemination of social security numbers on her website is more akin to transporting a short-barreled shotgun, and the amended statute before this Court is a narrowly-tailored constitutional limitation of her uncommon misuse of those personal identifiers.

The *Heller* opinion also differentiated the unconstitutional provisions from what essentially were time, place and manner colonial-era gun laws that Justice Breyer cited in dissent. *Id*. At 103-107. The Court emphasized that such laws, like the amended statute herein, even if enforced, had only civil penalties and would not be remotely severe enough in their restriction or burden to be in invalid conflict with the constitutional personal guarantee.

The Second Amendment contains exceptions to its constitutional guarantee. The First Amendment is no different. It has exceptions when it comes to disclosure of state secrets, libel, obscenity or offers to engage in illegal activity or when it abuts laws of general application, such as copyright, or when there are constitutional restrictions on time, place and manner of protected speech. Upholding the amended statute herein would not be a radical departure from some well-charted course of an absolute First Amendment guarantee to communicate whatever one wants.

Another recent case that pertains to this matter is *United States v. Williams,* which involved a First Amendment challenge to constitutionality of a statute prohibiting distribution of child pornography. Like the amended statute herein, the statute at issue in *Williams* does not target the underlying material but, rather, the collateral speech introducing such material into the distribution network. 2008 U.S. Lexis at 14. The Court found the statute constitutional because, like the amended statute herein, it has a scienter requirement, *Id.* at 15, and does not prohibit a substantial amount of protected expressive activity, *Id.* at 21. The Court made clear that to enjoy protection, material must have some "social value." *Id.* at 5-6. Dissemination of social security numbers, in and of themselves, has no social value, and the amended statute in no way inhibits the free exchange of ideas. To the contrary, dissemination of social security numbers serves *only* to facilitate invasion of personal privacy and identity theft, a crime, and is undeserving of First Amendment protection. As in *Williams*, the amended statute herein does not prohibit advocacy but only the provision of material that, in inchoate form, promotes a proscribed use.

Plaintiff in the case pending before this Court implicitly alleges, without specifically attempting to explain how, that a social security number itself is a matter of public concern. Courts properly focus on whether a compelling government interest can overcome a First Amendment right. *See The Florida Star v. B.J.F.,* 491 U.S. 524, 541 (1989). Government may not

sanction publication of lawfully obtained, truthful information, *as long as it is a matter of public concern.* Certainly, cases involving publication of information regarding criminal proceedings justify First Amendment protection; however, *Florida Star* is dissimilar factually from the matter before this Court. This is most evident where the Court noted that the matter of public significance for First Amendment analysis purposes was not the rape victim's name but, rather, the criminal investigation. *Id.* at 536-37.

Indeed, Plaintiff suggests *Florida Star* is entirely more broad or sweeping than its actual holding. The Court noted tension between the First Amendment and right to privacy and went out of its way to declare, "Our decisions involving government attempts to sanction the accurate dissemination of information as invasive of privacy, have not, however, exhaustively considered this conflict…we have emphasized each time that we were resolving this conflict only as it arose in a discrete factual context." *Id.* at 530.

The Court observed, as this Court should in the pending matter, that *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975), "cannot be fairly read as controlling here." *Id.* at 532. Justice White (who authored the *Florida Star* dissent) repeatedly wrote in *Cox Broadcasting* of the "special protected nature of accurate reports of *judicial* proceedings." (emphasis added) 420 U.S. at 492, 493, 496. One of the reasons in *Cox Broadcasting* for invalidating the award was the important role the press plays in subjecting trials to public

11

scrutiny and thereby helping guarantee their fairness. *Id*. at 492-493. Indeed, in *Cox Broadcasting*, the Court refused to answer the question as to "whether truthful publications may ever be subjected to civil or ciminal liability" for invading "an area of privacy" as defined by the state's legislature. *Id*. at 491. Instead, it focused on the publication of information "specifically, from judicial records which are maintained in connection with a public prosecution." *Id*. Moreover, it recognized that its holding applied to items that "should be made available to the public." *Id.* at 496. Plaintiff may not, has not and cannot reasonably argue or articulate how individual social security numbers, in and of themselves, are matters of general concern and why their dissemination in any way informs the public's right to know. *Florida Star* observed that such a role is not compromised where, as in the case pending in this Court, there were no criminal proceedings underway. 491 U.S. at 532.

A crucial part of the opinion makes clear that the Court remains forever alert to the real-world need to balance the First Amendment with legitimate privacy protection concerns manifested in popular sentiment and reflected by the citizens' elected representatives through their legislature. The Court stated, "Nor need we accept appellant's invitation to hold broadly that truthful publication may never be punished consistent with the First Amendment. Our cases have carefully eschewed reaching this ultimate question, mindful that *the future may bring scenarios which prudence*

*counsels our not resolving anticipatorily.*" (emphasis added) *Id*. The Court announced, "We continue to believe that the sensitivity and significance of the interests presented in clashes between First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case." *Id*. at 533. It concluded, "Our holding today is limited. We do not hold that truthful publication is automatically constitutionally protected, or that there is no zone of privacy within which that State may protect the individual from intrusion…We hold only that…punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order, and that no such interest is satisfactorily served…under the facts of this case." *Id*. at 541.

Interestingly, that this language merely was "suggested[ed]" by prior cases caused Justice White in dissent to refer to it as "the cautious qualifier," *Id*. at 545. In any event, unlike *Florida Star* and *Cox Broadcasting,* the facts of the case before this Court more than satisfactorily serve the high interest of constitutionally protecting the social security number, which, in and of itself, narrowly and exactly constitutes the zone of privacy set forth in Supreme Court precedent. Such a holding would be in conformance with, and in no way depart from, this line of cases.

In the *Florida Star* context, Plaintiff herein argues the social security number is an essential matter of public significance she must disseminate. The flaw is that the social security number itself is not a criminal

13

investigation, which is a matter of public significance. The social security number, in and of itself, is unnewsworthy and fairly defines the zone of privacy that must have legal protection in this new, internet-driven era. Its dissemination not only is an insufficient public concern but utterly is without and in conflict with the public concern. Plaintiff may not argue that possible application of the amended statute to her website would force on her the type of *Florida Star* "onerous obligation of sifting through." *Id*. at 536. Moreover, the amended statute categorically would not result in censorship of protected speech. In addition, the amended statute, in having a scienter requirement, compels the Commonwealth to present a level of proof that differs critically from *Florida Star*.

Plaintiff believes *Sheehan v. Gregoire*, 272 F. Supp.2d 1135 (W.D. Wash. 2003) is identical to the case before this Court; however, there are many facts that render it inapposite. Sheehan succeeded in a strictly *facial* challenge alleging that a statute banning publication of a range of information, *with intent to harm or intimidate*, was overbroad and vague. Sheehan wanted the public to be able to locate police so officers could be served with legal process and their homes picketed. Sheehan's communication facilitated the public interest, while the dissemination of social security numbers by Plaintiff herein serves no public interest. The amended statute prohibits dissemination only of unique, personal social security numbers; unlike the broad statute in *Sheehan*, (1) its application is

viewpoint-neutral and not dependent on thought-policing of the publisher's subjective intent in disseminating the information so as to silence a particularly hostile speaker or message, (2) there is no exclusive protection from its application afforded to commercial entities and (3) it focuses on a narrowly tailored means to serve the compelling interest of protecting citizens from the actual effect of the speech, invasion of privacy and identity theft.

The amended statute also is a law of general applicability that does not target or single out any viewpoint or person but, rather, is applicable to all. Significantly, it was Justice White who analyzed laws of general applicability in *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), noting, "We granted certiorari to consider the First Amendment implications of this case." *Id*. at 667. Justice White then went out of his way, two terms after *Florida Star*, to explain in *Cohen* that, like the Plaintiff before this Court, "Respondents rely on the proposition that, 'if a newspaper lawfully obtains truthful information about a matter of public significance, then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order.'" *Id*. at 668-669 (quoting *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 103 (1979)). Justice White observed that this quote "has been applied in various cases" and served as the basis for *Florida Star*. *Id*. at 669.

Justice White continued, "This case, however, is not controlled by this line of cases but rather by the equally well-established line of decisions holding that generally applicable laws do not offend the First Amendment...." *Id*. Plaintiff herein has no special immunity from application of general laws. She "has no special privilege to invade the rights and liberties of others." *Id*. at 670 (quoting *Associated Press v. NLRB*, 301 U.S. 103 (1937)). Distinguishing *Florida Star*, Justice White concluded by asserting that the First Amendment does not grant automatic protection from a law "which in any fashion or to any degree limits or restricts" a right to report truthful information. *Id*. at 671.

This Court should be mindful of Justice White's jurisprudential admonition in *Florida Star*, when he cautioned against hitting "the bottom of the slippery slope. I would find a place to draw the line higher on the hillside: a spot high enough to protect…privacy." 491 U.S. at 533. Again, the facts of the case before this Court more than satisfactorily serve the high interest of constitutionally protecting the zone of privacy set forth in Supreme Court precedent. Unlike *Florida Star, Daily Mail and Cox Broadcasting,* there is no public interest in disseminating social security numbers.

Social security numbers are not political speech. Dissemination of social security numbers allows efficient seizure of assets and serves *only* to facilitate invasion of personal privacy and identity theft; it is unrelated to *any* government operation and does *nothing* to afford public scrutiny of

16

government. Social security numbers hold a special position as personal identifiers not revealed to the public. Social security numbers are uniquely sensitive. Plaintiff's argument that the public interest is served by finding a constitutional right to disseminate social security numbers because upholding constitutional rights upholds the public interest is, at best, a tautology.

Access to a social security number enables a new holder to obtain access to and control other personal information. In *Greidinger v. Davis*, 988 F.2d 1344, 1352-54 (4th Cir. 1993), the Fourth Circuit held that there should be a differentiation on voter registration forms between social security numbers and other personal identifying information. The Court noted that social security numbers afford the possibility of serious invasion of privacy and that the harm inflicted is potentially financially ruinous. The Court provided a history of social security numbers. The Court described that over time, after recognizing the danger of widespread use of social security numbers as universal identifiers and in response to concern over accumulation of personal information, Congress passed the Privacy Act of 1974. The Court then declared in distinguishing social security numbers from other forms of personal information, "Since passage of the Privacy Act, an individual's concern over social security number confidentiality and misuse has become significantly more compelling." *Id.* at 1353.

Privacy is a reflection of the amount of access to personal information and the extent to which others may disseminate it. For most of history, personal privacy existed. Little information could be accessed through books. As a practical matter, real-life barriers protected publication of personal information. The internet changed this. Now, there is pervasive, modern-day means of electronic intrusion into people's personal life with dissemination around the world on the click of a button.

This case is at the frontier of internet law, and publication of social security numbers on the internet demands a different analysis. Virginia's ability constitutionally to proscribe dissemination of social security numbers should not be dependent on a long, pernicious history of citizen fear of being the target of an impending invasion of privacy; rather, the Commonwealth's interest in protecting against the rapid increase in internet-originated identity theft compels application of this narrowly tailored statute. The Virginia legislature consistently, and constitutionally, has protected individual privacy interests by limiting dissemination of social security numbers. The amended statute herein is part of the Commonwealth's direct attempt to proscribe the ability to transact in personally identifying social security numbers, which narrowly and exactly constitute the zone of privacy set forth in Supreme Court precedent.

## Conclusion

Section 59.1-443.2, *Code of Virginia* (1950, as amended) is constitutional. Defendant asks this Court to deny Plaintiff's requested relief.

Respectfully submitted,

ROBERT F. MCDONNELL,
Defendant herein

By: _____/s/_____
James V. Ingold, Esq.
Virginia Bar number 31825
Attorney for Robert F. McDonnell
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
Phone: 804-786-3860
Fax: 804-371-2087
JIngold@oag.state.va.us

ROBERT F. MCDONNELL
Attorney General of Virginia

MAUREEN RILEY MATSEN
Deputy Attorney General

PETER R. MESSIT
Senior Assistant Attorney General/Section Chief

JAMES V. INGOLD (VSB No. 31825)
Senior Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
900 East Main Street
Richmond, Virginia 23219
(804) 786-3860
(804) 371-2087 (FAX)

CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

By: _____/s/_____
James V. Ingold, Esq.
Virginia Bar number 31825
Attorney for Robert F. McDonnell
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
Phone: 804-786-3860
Fax: 804-371-2087
JIngold@oag.state.va.us