

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BETTY J. OSTERGREN,

    Plaintiff,

v.                                    Civil Action No. 3:08cv362

ROBERT F. McDONNELL, in his
official capacity as
Attorney-General of Virginia,

    Defendant.

## MEMORANDUM OPINION

Plaintiff, Betty Ostergren, has filed a Verified Complaint ("Complaint") against Robert F. McDonnell, Attorney-General of Virginia, in his official capacity, for declaratory and injunctive relief against Va. Code Ann. § 59.1-443.2 as applied. The action is filed pursuant to 42 U.S.C. § 1983 seeking to redress an alleged violation of the First Amendment to the Constitution of the United States.

During the June 30, 2008 hearing on the Motion for Preliminary Injunction, the Attorney-General represented that he would not enforce the law against Ostergren pending final resolution of this action, mooting the Motion for Preliminary Injunction. The parties have since briefed the issues and the Court has conducted a hearing on a stipulated record, and the case is now ready for disposition.

## STATEMENT OF FACTS

The parties have agreed upon a Stipulation Of Facts (Docket No. 13). No material facts are in dispute.

For several years, clerks of court in Virginia, acting under authority conferred by Virginia's legislature, have made available on the Internet ("online") land records that are maintained in the office of the clerks of court in each city and county in Virginia. Of course, the clerks of court, by law, are required to maintain publicly available real (and some personal) property records in the courthouse and to have them available for public inspection. The land records contain many documents by which land is conveyed and encumbered, such as deeds, deeds of trust, divorce decrees, and documents which evidence the financing and ownership of land. Counsel for the Attorney-General has advised that the impetus for placing these records online came largely from the real estate industry because to do so facilitated real estate transactions of all sorts. Years ago, Virginia's General Assembly blessed this process and authorized the clerks to charge fees for online access to public records. Va. Code. Ann. §§ 17.1-276, 279, 292.

For some time, not disclosed by the record, lawyers have included Social Security numbers ("SSNs") in a significant number of documents tendered to the clerks of court for filing in the land records. As the clerks of court began to make land records

2

available online, they did nothing to redact from them the SSNs. And, until 2007, Virginia law did not require the clerks to redact SSNs from land records before making them available online. That requirement was conditioned on the General Assembly making funding available, and the General Assembly did not provide the funding.

Ostergren, who is a resident of Hanover County, Virginia, advocates for privacy rights in Virginia and nationwide. (Stip. ¶¶ 2, 3). Ostergren opposes the posting of land records online without redacting the SSNs. She has lobbied the General Assembly to stop that practice. As part of her advocacy work, Ostergren established the website www.TheVirginiaWatchdog.com in 2003. (Id. ¶ 5.) On this website, Ostergren has posted examples of public records that are available online and that contain SSNs. (Id.) Her stated reason for doing so is to demonstrate graphically to members of the public that their own personal information may be available online somewhere. (Id. ¶ 5.) As "an object lesson" and for "shock value," Ostergren decided to post mainly the SSNs reflected in the land records of "legislators and clerks [of court] because, in her view, they are principally responsible for the online availability of millions of records containing SSNs." (Id. ¶ 12). Her website also includes public records obtained from government websites in other states. (Id.) The land records on the website appear along with written advocacy in support of Ostergren's views.

Virginia law establishes a so-called "secure remote access" system which allows individuals, for a nominal fee, to obtain online access to land records of a given locality. (Id. ¶ 6.) Ostergren paid the fee and secured the online land records that are posted on her website. (Id.)

At issue in this action is a provision of Virginia's Personal Information Privacy Act ("PIPA"), Va. Code. §§ 59.1-442 - 59.1-444. Section 59.1-443.2 provides, inter alia, that "a person shall not. . . [i]ntentionally communicate another individual's social security number to the general public." This provision took effect on July 1, 2008; however before then, the statute contained an exception for "records required by law to be open to the public." Va. Code. § 59.1-443.2(D) (2007). That exception was removed to create the current version of the statute which Ostergren asserts is unconstitutional as applied to her.

Ostergren explains that her activities -- posting copies of actual public records with SSNs clearly identified -- fell within the scope of the old exception, but would now be subject to a range of civil sanctions, including fines, investigative demands, and injunctions. Va. Code Ann. § 59.1-201-59.1-206 (West 2008). Counsel for the Attorney-General agreed that, if Ostergren maintained her website with the posted records, she would be violating the law and subject to those sanctions.

4

Ostergren represents that she obtained the unredacted public records that she posted on her website through the secure remote access system. (Decl. of Betty J. Ostergren ¶¶ 3, 11 - 14).[1] She argues that the State, having made these documents available to the public on the Internet through secure remote access, cannot now prohibit her from posting those documents on her website in furtherance of her advocacy efforts.

The Plaintiff's as-applied challenge relies on a line of Supreme Court precedent that includes Cox Broadcasting Corp. v. Cohn, 420 U.S. 469 (1975) and The Florida Star v. B.J.F., 491 U.S. 524 (1989). Based on those decisions, Ostergren argues that she cannot be punished for truthful publication of records which the State itself made public. The Attorney-General argues that the statute is constitutional as a generally applicable law intended to prevent the dissemination of highly private SSNs. He also argues that there is no public interest in specific SSNs and that Ostergren does not need to actually post SSNs in order to make her point.

## DISCUSSION

[1] Obstegren objected to paragraphs 2, 4, 6, 7, 8 in the Affidavit of John Hicks, of which paragraphs 4, 7, and 8 discussed how Ostergren obtained the records she publishes on her website. The Court, with concurrence of counsel for the defendant, sustained the objection, so the factual record on which the Court renders its opinion provides only that Ostergren's source of the unredacted land records published on her website is the Internet-based secure remote access system created by the State.

5

Section 1983, of course, is merely a procedural vehicle which permits the assertion of claims based on the violation of the United States Constitution or federal statutes or regulations. Albright v. Oliver, 510 U.S. 266, 271 (1994). To succeed on a claim under Section 1983, a plaintiff must allege and prove that: (1) the defendant or defendants engaged in conduct which deprived her of a clearly established federal Constitutional right; (2) that defendant or defendants acted were acting under color of State law; and (3) the acts of that defendant or defendants proximately caused the damages plaintiff claims to have sustained. See Amato v. City of Richmond, 875 F. Supp. 1124, 1133 (E.D. Va. 1994) (citing 3 Devitt, Blackmar & Wolff, Federal Jury Practice and Instructions § 103.03; Kentucky v. Graham, 473 U.S. 159, 166, (1985)).

The Attorney-General does not argue that the asserted right is not clearly established. Nor does he challenge the color of law assertion or that Ostergren can be punished for violating the statute at issue if she leaves her website as it is. Instead, he asserts that Ostergren lacks standing; that the action is not ripe; and that the statute satisfies all constitutional requirements, thereby joining issue on the substantive validity of the claim.

## A. Standing and Ripeness

The Attorney-General argues that: (1) Ostergren has no standing to mount a pre-enforcement challenge to the statute

6

because it imposes only civil penalties; and (2) her claim is not ripe for judicial resolution. Ostergren argues that plaintiffs in the First Amendment context are allowed to bring as applied, pre-enforcement challenges to civil statutes, and that the facts of this controversy are sufficiently developed to render it ripe for judicial review.

### 1. Standing

The doctrine of standing is an integral component of the case or controversy requirement. Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006). There are three components of constitutional standing: (1) the plaintiff must suffer, or have suffered, an actual or threatened injury that is not conjectural or hypothetical, (2) the injury must be fairly traceable to the challenged conduct; and (3) a favorable decision must be likely to redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 1992). Ostergren, as the party attempting to invoke federal jurisdiction, bears the burden of establishing standing. See Miller, 462 F.3d at 316. The standing requirement "ensures that a plaintiff has sufficient personal stake in a dispute to render judicial resolution appropriate" and "tends to assure that the legal questions presented to the court will be resolved, not in the rarefied atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." Piney Run Preservation Ass'n v.

County Comm'rs of Carroll County, 268 F.3d 255, 262 (4th Cir. 2001).

There is no dispute that the second and third components of constitutional standing are met: the putative First Amendment injury to Ostergren can be fairly traced to the State's action in amending the statute and a favorable decision on the merits would redress Ostergren's asserted injury. See Lujan, 504 U.S. at 561-62 (stating that in a suit involving government action or inaction against the plaintiff himself, "there is ordinarily little question that the action or action has caused him injury, and that a judgment preventing or requiring the action will redress it."). The Attorney-General, however, asserts that the first of these components -- injury-in-fact -- is lacking.

An "injury-in-fact" is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Id. at 560 (internal quotation marks and citations omitted). Where a party brings a pre-enforcement challenge to a statute or regulation, it must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest," and "there must exist a credible threat of prosecution under the statute or regulation." Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n, 263 F.3d 279 (4th Cir. 1991) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).

8

The Attorney-General argues that no injury-in-fact can be alleged in a pre-enforcement challenge to a statute that imposes only civil penalties. The Attorney-General cites no decision which actually so holds. Instead, he correctly observes that the cases which extend wide latitude in standing requirements in First Amendment pre-enforcement challenges most commonly are cases that challenge criminal statutes. That is true, but it is not also the case that pre-enforcement challenges are limited to criminal statutes. First Amendment pre-enforcement challenges can be brought against civil statutes where the standing requirements are met. See Allen, Allen, Allen & Allen v. Williams, 254 F. Supp. 2d 614, 624-25 (E.D. Va. 2003) (allowing pre-enforcement challenge of Rule 7.1(a)(3) of Virginia Rules of Professional Conduct as applied to plaintiffs); Bland v. Fessler, 88 F.3d 729, 737 n. 11 (9th Cir. 1996) (allowing pre-enforcement challenge to civil statute, noting that "although [plaintiff and other similarly situated parties] in California do not face criminal penalties, they do face grave consequences for violations of the civil statute, including civil fines and private suits for penalties"); J.L. Spoons, Inc. v. Brown, 40 F. Supp. 2d 902, 905 (N.D. Ohio 1999) (allowing pre-enforcement challenge of Ohio Liquor Control Commission rule where civil penalties included fines and/or revocation of liquor permits). In other words, the fact that civil, rather than

criminal, sanctions are at issue does not mean that the injury-in-fact component cannot be satisfied.

Kemler v. Poston, 108 F. Supp. 2d 529 (E.D. Va. 2000), cited by the Attorney-General, does not hold to the contrary. The plaintiffs in Kemler sued to enjoin an advisory opinion issued by the Judicial Ethics Advisory Committee, which was susceptible of enforcement by the Judicial Inquiry and Review Commission and Supreme Court of Virginia. It was not clear if the conduct at issue would be a violation of the advisory opinion, much less that plaintiffs would be subjected to disciplinary action, even if the engaged-in conduct were contrary to the advisory opinion. Although in Kemler, the Court noted that the plaintiffs were "not challenging a criminal statute," its rationale for finding the absence of standing was that the plaintiffs had not "adequately established that the state administrative structure which they seek to enjoin compels them to do, or to refrain from doing anything." Id. at 538. The Court also found that the plaintiffs' theory of injuries overlooked a "multitude of contingencies" which had to occur before the apprehended injury occurred. Id. at 538.

In this case, the Attorney-General has asserted that Ostergren's website, and thus her present conduct in maintaining it online, violates the statute, and he has not eschewed future enforcement against her. See Mot.'s Tr. 24-25, 47-48, June 30, 2008. Unlike the anti-fornication and anti-cohabitation laws of Doe

v. Duling, 782 F. 2d 1202, 1206 (4th Cir. 1986), Va. Code § 59.1-443.2 is no moribund, historically un-enforced law.  As the Fourth Circuit stated in Mobil Oil Corp. v. Attorney General of Commonwealth of Va., 940 F.2d 73, 76 (4th Cir. 1991) in allowing a pre-enforcement challenge to amendments to the Virginia Petroleum Products Franchise Act, "The state has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."  Mobil Oil Corp. distinguished the then recently enacted amendments from the nineteenth century fornication statute in Doe v. Duling by observing that "[i]n the instant case, the amendment is newly enacted.  It would be unreasonable to assume that the General Assembly adopted the 1985 amendment without intending that it be enforced."  Id.

Ostergren is not required to face the threat of civil penalties to continue publishing her website which, up until July 1, 2008, was permitted under the law.  Standing requirements have been historically relaxed in First Amendment cases -- "when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged."  Kemler v. Poston, 108 F. Supp. 2d 529, 535 (E.D. Va. 2000) (citing Sec'y of State of Md. V. Joseph H. Munson Co., Inc., 467 U.S. 947, 956 (1984)).  Ostergren faces serious fines should she continue her actions and that prospect would certainly chill her speech.  There

is injury-in-fact and all the other components of standing are satisfied. Ostergren therefore has standing to pursue this suit.

## 2. Ripeness

"The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form.'" Miller, 462 F.3d at 318-19 (citing Rescue Army v. Mun. Court of L.A., 331 U.S. 549, 583 (1947)). Ostergren has the burden of proving ripeness. Renne v. Geary, 501 U.S. 312, 316 (1991). The ripeness inquiry is similar to, and overlaps with, the standing inquiry. Miller, 462 F.3d at 319.

To determine whether a case is ripe, a court must "balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." Id. (quoting Franks v. Ross, 313 F.3d 184, 194 (4th Cir. 2002)). As to the first element -- fitness for review -- "[a] case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." Id. (citation omitted). The second element -- hardship -- examines the immediacy of the threat and the burden on the plaintiff who would be compelled to act under threat of enforcement of the challenged law, and also considers the cost to the parties of delaying judicial review. Id.

The Attorney-General's main argument on ripeness is that the hardship element is not satisfied. According to the Defendant, the

12

Plaintiff "may not legitimately allege that her protected speech has been 'chilled' in an 'immediate, direct and significant' way." (Def.'s Br. On Standing/Cohen v. Cowles Media 7). The Defendant also notes in passing that "[t]his Court is without a concrete record on which to analyze Plaintiff's claim," which goes to the first prong.

To the contrary, this case is fit for judicial review. The factual situation is well-developed. The parties have entered into a Stipulation of Facts, and the Attorney-General has identified no material facts that are in dispute. The parties argue only on the application of the law. Although the Attorney-General has submitted an affidavit averring that the clerks of court are in the process of redacting the documents, Ostergren's objection to the affidavit was sustained with the agreement of counsel for the Attorney-General. Even if those assertions are accepted as true, that does not mean that the case is not ripe for review. Instead, it just suggests that some months or years down the line, there might be a different factual scenario and stronger defense for the State. However, as discussed in the previous section, Ostergren's speech will be chilled in the meantime, if she cannot challenge the law. Ostergren faces hefty fines, if nothing else, which chills her speech in an immediate, direct, and significant way.

## B.  Constitutionality of Statute As Applied

The parties have offered two competing frameworks for evaluating the constitutionality of the challenged law.  Ostergren contends that this case is governed by the Supreme Court's decision in Cox Broadcasting Corp. v. Cohn, 420 U.S. 469 (1974) and its progeny.  In opposition, the Attorney-General maintains that the challenged statute is a law of general applicability governed by Cohen v. Cowles Media Co., 501 U.S. 663 (1991).  The Attorney-General also asserts that, even if Cox Broadcasting and its progeny supply the proper analytic framework, the statute passes muster because SSNs are not matters of public significance.

This case, like Cox Broadcasting and Cowles Media, presents yet another conflict between the First Amendment and the precepts which it protects and the right of citizens to a measure of privacy from having personal information made available to the public.  It thus is necessary to outline how the Supreme Court has dealt with such conflicts and then to determine how this conflict should be resolved consistent with the principles laid down by the Supreme Court.

### 1.  Cox Broadcasting and Its Progeny

In Cox Broadcasting, the Court was called upon to decide whether a state could permit a claim for damages for invasion of privacy caused by the publication of the name of a deceased rape victim which the newspaper had obtained in court records in

14

connection with the prosecution of the crime. Cox Broadcasting Corp. v. Cohn, 420 U.S. at 471. The Court held that the existence of such a claim was inconsistent with the First Amendment.

The reporter in Cox Broadcasting had secured the name of the victim from examination of the indictment which was made available in the courtroom. Further, the record established that indictments were public records that were available for inspection. Thereafter, the reporter published the name of the rape victim in an article about the proceedings. Her father subsequently filed a civil action asserting that his right of privacy was invaded by the broadcast.

Justice White began the analysis for the Court, recognizing that "the century has experienced a strong tide running in favor of the so-called right of privacy." Id. at 487-88. The Court explained that there were "impressive credentials for a right of privacy," id. at 489, but did not extensively define the scope of that right.

In Cox Broadcasting, as well as in the cases that followed, the Supreme Court took pains to emphasize that its decisions were based on narrow grounds and were not meant to establish any broad precedent on whether truthful publication could ever be subjected to civil or criminal liability consistent with the First and Fourteenth Amendments. Cox, 420 U.S. at 491 ("it is appropriate to focus on the narrower interface between press and privacy that this

case presents"); <u>Smith v. Daily Mail Pub. Co.</u>, 443 U.S. 97 at 106 (1979) ("Our holding in this case is narrow."); <u>Florida Star v. B.J.F.</u>, 491 U.S. 524, 532-33 ("Our cases have carefully eschewed reaching this ultimate question [whether truthful publication may never be punished consistent with the First Amendment], mindful that the future may bring scenarios which prudence counsels our not resolving anticipatorily. . . . We continue to believe that the sensitivity and significance of the interests presented in the clashes between the First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case."). Thus, in striking the appropriate balance between privacy interests and the interests protected by the First Amendment, it is necessary to decide this case narrowly in perspective of the facts presented in the record.

In <u>Cox Broadcasting</u>, the Court explained that accurate reports of judicial proceedings had long been accorded special protection. <u>Cox Broadcasting v. Cohn</u>, 420 U.S. at 492-93. Citing the Restatement of Torts, section 867, the Court noted that "there is no liability when the defendant merely gives further publicity to information about the plaintiff which is already public." <u>Id.</u> at 493-94. The Court went on to quote from the Restatement to emphasize that:

> There is no liability for the examination of a
> public record concerning the plaintiff, or of

16

documents which the plaintiff is required to keep
        and make available for public inspection.

Id. With those principles in mind, the Court explained that:

        Thus, even the prevailing law of invasion of privacy
        generally recognizes that the interests in privacy
        fade when the information involved already appears on
        the public record.

Id. at 495. The Court went on to explain the fundamental principle

that:

        By placing the information in the public domain on
        official court records, the State must be presumed to
        have concluded that the public interest was thereby
        being served. Public records by their very nature
        are of interest to those concerned with the
        administration of government and the public benefit
        is performed by the reporting of the true contents of
        the records by the media. The freedom of the press
        to publish that information appears to us to be of
        critical importance to our type of government in
        which the citizenry is the final judge of the public
        conduct of public business.

Id. at 495.

        To explain the importance of not prohibiting the publication

of information in public records, the Court explained that a rule

that permitted prohibition would make it difficult for the media to

inform the public about the public business and would invite self-

censorship which might likely lead to the suppression of items that

would otherwise be published and should be made available to the

public. Id. at 496. Thus, in announcing the basic rule that the

press could not be exposed to liability for truthfully publishing

information released to the public in official court records, the

17

Supreme Court sought to make sure that the media would be able to inform the citizenry about the public business; that the appropriate rule not invite self-censorship; and that suppression of items that ought to be made public would not occur. It was thus in that context that the Supreme Court held that:

At the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records.

Id. at 496.    The Court went on to explain that:

If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information.    Their political institutions must weigh the interest in privacy with the interest of the public to know and of the press to publish.    Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it.

Id.

     The Supreme Court again decided a conflict between the First Amendment and the right to privacy in Smith v. Daily Mail Pub. Co., 443 U.S. 97 (1979).    In Daily Mail, the Supreme Court held that a West Virginia statute prohibiting the publishing of the name of any youth charged as a juvenile offender could not lawfully be applied to newspapers which obtained and published the name of a juvenile shooter through normal, lawful news gathering practices.    Reviewing Cox Broadcasting, among other cases, the Court noted that its precedents "suggest strongly that if a newspaper lawfully obtains

truthful information <u>about a matter of public significance</u> then state officials may not constitutionally publish publication of the information, <u>absent a need to further a state interest of the highest order.</u>" <u>Id.</u> at 103. (emphasis added).

In <u>Daily Mail</u>, the court examined the interests served by the statute at issue and explained that its sole objective was to "protect the anonymity of the juvenile offender." <u>Smith v. Daily Mail Publishing Co.</u>, 443 U.S. at 104. The Court also observed that an ancillary purpose of confidentiality would be to further rehabilitation. Emphasizing the need to balance the interest sought to be advanced by the statute under attack with the important right created by the First Amendment, the Court held that the West Virginia statute at interest was "not sufficient to justify application of a criminal penalty to respondents." <u>Id.</u> The decision also appears to have been significantly influenced by the fact that the statute applied only to print media and did not restrict the electronic media or any other form of publication from printing the names of the youths charged in juvenile proceedings.[2]

---

[2] The Court in <u>Daily Mail</u> explained that its holding was a narrow one and that what was at issue was simply the power of a State to punish truthful publication of an alleged juvenile delinquent's name that was lawfully obtained by a newspaper. It specifically held that "there is no issue here of privacy...." <u>Id.</u> at 106. That is an odd statement considering that the case actually focused on a statute, the purpose of which was to protect the privacy of the juvenile and thereby advance several articulated public purposes, assertedly significant in nature.

19

The concurring opinion of then Justice Rehnquist, affords an appropriate explanation of the issue presented in cases such as this, by explaining that:

> Historically we have viewed freedom of speech and of the press as indispensable to a free society and its government. But recognition of this proposition has not meant that the public interest in free speech and press always has prevailed over competing interests of the public. "Freedom of speech thus does not comprehend the right to speak on any subject at any time," . . . and "the press is not free to publish with impunity everything and anything it desires to publish." . . . While we have shown a special solicitude for freedom of speech and of the press, we have eschewed absolutes in favor of a more delicate calculus that carefully weighs the conflicting interests to determine which demands the greater protection under the particular circumstances presented.

Smith v. Daily Mail Publishing Co., 443 U.S. at 106 (Rehnquist, J. concurring) (internal citations omitted).

The principles of Daily Mail were further expanded in The Florida Star v. B.J.F., 491 U.S. 524 (1989) wherein the Supreme Court concluded that a weekly newspaper could not be found civilly liable for printing the name of the victim of a sexual offense which the newspaper had obtained from a police report. First determining that Cox Broadcasting was not controlling because the information printed by the Florida paper had been garnered from a police report rather than from courthouse records and because fairness of a trial was not implicated, the Court resolved the case by applying what it termed the "Daily Mail formulation,"

20

synthesized from its prior decisions including Cox Broadcasting: "If a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." 491 U.S. at 534 (citing Daily Mail, 443 U.S. at 103) (emphasis added). The Court explained that, in addition to the public interest in the dissemination of truth, according the press the protection of the Daily Mail formulation was supported by three principles.

First, the Court explained that Daily Mail protects only the publication of information that has been lawfully obtained. Thus, the government could, under some circumstances, forbid the non-consensual acquisition of sensitive information in private hands, thereby placing such information beyond the scope of Daily Mail. Then, with the respect to information in the government's custody, the Court noted that the government "has even greater power to forestall or mitigate the injury caused by its release." Id. at 534. The government could, the Court observed, classify information, "establish and enforce procedures ensuring its redacted release," or create a damages remedy against mishandling of information. Id. "Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts." Id.

Second, the Court was persuaded that "punishing the press for the dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act." Id. at 535. It explained that, "where the government has made certain information publicly available, it is highly anomalous to sanction persons other than the source of its release." Id. Referring to Cox Broadcasting and Daily Mail, the Court repeated its previous statements that, by placing information in the public domain, the State must be presumed to have concluded that the public interest was served by such public dissemination or, relatedly, that meaningful public interest likely could not be found in restraining the further dissemination of information already on the public record. Id.

As its third and final consideration, the Court expressed concern about the "'timidity and self-censorship' which may result from allowing the media to be punished for publishing certain truthful information," id., and thus determined that it was constitutionally impermissible to "force upon the media the onerous obligation of sifting through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication." Id. at 536. On that point, the Court explained that "[t]his situation could inhere even where the newspaper's sole

object was to reproduce, with no substantial change, the government's rendition of the event in question." Id.

The principles that were announced in Cox Broadcasting, Daily Mail, and Florida Star provide the framework for analysis of the statute here at issue. Thus, the assessment will proceed with them in mind.

## 2. Analysis

Cox Broadcasting and its progeny, of course, assessed the protection accorded by the First Amendment to the press. Although Ostergren's website is not traditional news media like the newspapers involved in the above-described cases, her website -- even in title -- undertakes the government watchdog role protected by the First Amendment. Her website is "analytically indistinguishable from a newspaper." Sheehan v. Gregoire, 272 F. Supp. 2d 1135, 1145 (W.D. Wash. 2003) (noting that plaintiff's website on police accountability "communicates truthful lawfully-obtained, publicly-available personal identifying information with respect to a matter of public significance"). There is furthermore no jurisprudential basis for according the Internet differential treatment under the First Amendment.[3] See Reno v. ACLU, 521 U.S.

---

[3] Indeed, it might be said that the Internet has taken over the role of traditional print media. It can hardly be contested that there is an ongoing shift away from traditional print media toward the internet. See John Ibbitson, Extra, extra, read all about it - or, sadly, not, The Globe and Mail, July 9, 2008, at A13 (describing year over year nationwide decline in newspaper

844, 870 ("We agree with [the district court's] conclusion that our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium [of the internet]."). It is difficult to imagine a more archetypal instance of the press informing the public of government operations through government records than Ostergren's posting of public records to demonstrate the lack of care being taken by the government to protect the private information of individuals. Consequently, the principles of those Supreme Court cases apply to the assessment of the statute as applied to Ostregren's actions.[4]

First, the records published on Ostergren's website quite clearly were obtained largely from a government source, the circuit courts, and are part of official court records that are open to public inspection. Before Ostergren even published those records, the State had made them publicly available online to anyone who paid a nominal access fee. The records at issue are not identical to those before the Court in Cox Broadcasting, but are closely akin to the records of judicial proceedings which were at issue there.

___

circulation and decreased ad revenues as readers turn to the internet without coordinate advertiser migration); Annys Shin, Newspaper Circulation Continues to Decline, The Washington Post, May 3, 2005, at E03 (describing how that year's decline "continued a 20-year trend in the newspaper industry as people increasingly turn to other media such as the Internet and 24-hour cable news networks for information.").
[4] Defendant agreed at the hearing on the preliminary injunction that there was no difference between a newspaper and Ostregren's website "as a legal matter." See Mot.'s Tr. 39, June 30, 2008.

24

And, because the records here at issue are maintained by court officers in courthouses, they are closer to the Cox Broadcasting model than to the fact pattern in Daily Mail and Florida Star.

Second, the SSN's in the court records are without doubt personal in nature and are entitled to privacy because they are the quintessential personal identifier; and SSNs are susceptible to misuse that can cause great harm, such as identity theft. Therefore, it should not be difficult for a court to conclude that the protection of SSNs from public disclosure should qualify as a State interest of the highest order.  However, it is not the perception of a federal court that defines a State interest of the highest order.  Instead, it is the State's view and its conduct that, under accepted First Amendment jurisprudence, must supply the basis for such a conclusion.

In this case, the State's own conduct in making those SSNs publicly available through unredacted release on the Internet significantly undercuts the assertion made by the State in this litigation that the State actually regards protection of SSNs as an interest of the highest order.  It becomes even more difficult to accept the State's "interest of the highest order" argument on this record because, when the State realized the harm to which its practice was exposing its citizens, the legislative response did not signal that the General Assembly considered protection of SSNs to be an interest of the highest order.  Indeed, the Virginia law

which required redaction of SSNs from land records already online allowed the clerks of court a period of three years to accomplish the redaction task. Va. Code Ann. 17.1-294, Historical and Statutory Notes; Acts 2007, chs. 548, 626 (West 2008). Even that deadline was not to take effect unless funding to support the effort was provided by the legislature, and the record shows that the funding was not provided by the General Assembly.

It is not possible on this record to conclude that the State regards preventing disclosure of SSNs through online public land records to be an interest of the highest order. The record does not disclose when Virginia first started posting its land records online or when it became the practice for lawyers to place SSNs on documents filed in the publicly available land records. But, the parties agree that both practices have existed for several years. And, both parties agree that, in the past several years, identity theft has been steadily increasing and has been widely publicized. Indeed, several years ago, Virginia recognized that SSNs should be removed from drivers' licenses to afford protection from identity theft, replacing them with a different kind of identifying number that was not readily usable to falsify identity. See H.B. 1593, Va. Gen. Assem., Reg. Sess. (Va. 2003).

Mindful of these facts, the General Assembly, in 2007, enacted statutes that required the clerks of court to make all land records available on the Internet by so-called secure remote access

by July 1, 2008. Also, in 2007, the General Assembly required the clerks, by 2010, to redact SSNs from land records before making them available online, but rendered that provision a nullity by conditioning its effectiveness on the availability of State funding and then declining to provide funding for redaction.

Here, as in Florida Star, this record shows that it was within the State's power to forestall the release of private information because it could "establish and enforce procedures ensuring [the] redacted release" of court records. The Florida Star v. B.J.F., 491 U.S. at 534. Indeed, the General Assembly simply could have set a schedule for online release of its land records that require redaction of SSNs before placing the land records online.

The record here discloses no compelling reason for making land records available online. At oral argument, counsel for the Attorney-General advised that it was done at the request of the real estate industry. Whatever the reason, the settled law has long been that the burden of redacting private information from State records cannot be placed on those who would publish truthful information that is in records that the State has made available to the public. See Florida Star, 491 U.S. at 535-36.

More importantly for today's case, federal courts are not at liberty to articulate the State's interest of the highest order. That task rests with the State. When, as here, a State legislature has expressed its own view of the priority of a State interest, a

federal court is not permitted to revise that view to save the statute. Certainly, that is true where, as here, several Supreme Court decisions rather clearly pointed the way to articulating the kind of interest that could override the interests protected by the First Amendment. That the Virginia legislature and the clerks of court did not follow that guidance is not a matter to be remedied by a federal court, no matter how much it considered a remedy to be necessary.

Third, it is beyond dispute that the topic addressed both by the statute at issue and by Ostergren's website, on which the land records containing SSNs of legislators and clerks are published, is a matter of public significance. Indeed, both the statute and Ostergren's website seek to accomplish the same objective: prohibiting release of SSNs to the public. The Attorney-General concedes as much, but argues that Ostergren can effectively conduct her advocacy by redacting the SSNs from her website. For her part, Ostergren says that posting the actual SSNs of the approximately twenty legislators and clerks serves as an object lesson to those who are responsible for the release of the SSNs that are on the land records and that it also has a shock value which drives home the effectiveness of her political message in a way that nothing else will.

The Attorney-General has cited no decision which allows the courts to parse political speech in assessing whether it is

constitutionally permissible to regulate that speech.   Nor has the

Court found any such authority.

    The Supreme Court has provided, however, some guidance.   For

example, in Florida Star the Supreme Court expressed its view that

media would suffer a chilling effect if it were held liable for

publishing truthful information.   Id. at 535.   That is acutely the

case with the type of public records reproduced here, and it is not

the burden of one publishing public information to determine

whether public records have been appropriately redacted or risk

liability for publishing the record.   Id. at 536.   While the

relative chill caused Ostergren for her deliberate publication of

public records because of their exposure of social security numbers

might be different from that caused to newspapers timid about

publishing unredacted public records for fear of exposing sensitive

information, it would seem an anomalous result to accord more First

Amendment protection to the publication of public records for

incidental purposes than for the primary purpose of alerting the

public to issues with the documents themselves.

    In contrast to the credit report at issue in Dun & Bradstreet,

Inc. v. Greenmoss Builders, Inc., cited by the defendant, the

public records with unredacted social security numbers posted on

Ostergren's website involve more than just "the individual interest

of the speaker and its specific business audience."   Dun &

Bradstreet, 472 U.S. 759, 762 (1985).   As discussed above, the

Attorney-General does not contest the political nature of Ostergren's speech, as she claims the same public interest as the State. His only argument is that the publication of specific SSNs is not necessary for her message. Whether or not the SSNs are subjectively "necessary" for her message does not change the nature of the speech here at issue from its clearly political nature. Furthermore, Ostergren's website is a not-for-profit enterprise deserving of more protection than commercial pursuits. Compare Dun & Bradstreet, 472 U.S. at 763 (finding that the speech at issue was "solely motivated by the desire for profit which. . . is a force less likely to be deterred than others.").

The decision might be very different if Ostergren were stripping social security numbers from records and publishing them in list form. However, she has published public records in their unredacted entirety and Cox Broadcasting and Florida Star do not allow this Court to conclude that the wholesale republication of unredacted government records is punishable under the First Amendment. Release of SSNs on the Internet is undoubtedly a matter of public concern, and the First Amendment does not dictate the means by which Ostergren can undertake her political advocacy, provided that she has obtained her information lawfully and otherwise comports with the Daily Mail formulation.

What happened here is simple. The State's land records long have been maintained, and have been available for public

inspection, in the courthouse.  For several years, some of those records have contained SSNs and nonetheless have remained fully available for public inspection.  Fully aware of those facts, the General Assembly and the clerks of court have made those records available on the Internet without redacting SSNs.  In 2007, again fully aware that public land records contained SSNs, the General Assembly legislated that all land records be available online by July 1, 2008, again without requiring that SSNs be redacted before placing the public records online.  The General Assembly recognized the propriety of redaction by requiring it to occur within three years provided that funding was made available to accomplish that task.   Thereafter, the General Assembly did not providing that funding.   Instead, it sought to address the problem by removing from a statute that prohibited making SSNs available to the public, an exception that permitted the publication of SSNs from already available public records.

In so doing, the Virginia legislature ignored existing Supreme Court decisions which required that States address problems of this sort by taking steps less drastic than sanctioning the publication of public records.  Those same decisions also provided guidance about what could qualify as a State interest of the highest order, but the Virginia legislature did not conform to those requirements. Under the applicable Supreme Court decisions, the State cannot

sanction Ostergren for publishing, as part of her advocacy, the public land records reproduced on her website.

Notwithstanding the potential serious consequences that can come from the State's practices, it is not appropriate for a federal court to act where the General Assembly did not. To do so would be to engage in judicial legislation to alter the Virginia law to have it conform with Supreme Court precedent. That is not within the charter of a federal court.

Finally, the Attorney-General asserts that the statute is one of general applicability and that it passes muster under Cohen v. Cowles Media Co., 501 U.S. 663, (1991). However, Virginia Code § 59.1-443.2 is, on its face, a content-based law. See Satellite Broadcasting and Commc'ns Ass'n v. Fed. Commc'ns Comm'n, 275 F.3d 337, 353 ("First, we must examine the plain terms of the regulation to see whether, on its face, the regulation confers benefits or imposes burdens based upon the content of the speech it regulates."); cf. Cox, 420 U.S. at 495 (not undertaking content-based analysis, but noting that "[t]he Georgia cause of action for invasion of privacy through public disclosure of the name of a rape victim imposes sanctions on pure expression – the content of a publication – and not conduct or a combination of speech and nonspeech elements that might otherwise be open to regulation or prohibition."). Therefore, Virginia Code § 59.1-443.2 is not a law

of general applicability and <u>Cohen v. Cowles Media Co.</u> does not apply.[5]

## CONCLUSION

For the reasons set forth above, the Court will declare that Virginia Code § 59.1-443.2 is unconstitutional as applied to Ostegren's website as it presently exists. However, given the significant public interest issues presented by the spreading of SSNs on the Internet, the Court will require further briefing on the propriety and scope of an injunction other than with respect to Ostegren's website as it exists.

It is so ORDERED.

_____/s/_____   REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
August 22, 2008

---

[5] With Virginia Code § 59.1-443.2, the State directly regulates speech based on its content. In contrast, in <u>Cohen v. Cowles Media</u>, the parties themselves determined "the scope of their legal obligations, and any restrictions that may be placed on the publication of truthful information are self-imposed." 501 U.S. 663, 671 (1991).